IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHN MANNING,

       Plaintiff,

vs.                               No. CIV 03-225 JP/LCS

RON LYTLE, ART MURPHY,
JIMMY PADILLA, and CORRECTIONAL
MEDICAL SERVICES, INC.

       Defendants.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment (Doc. 20), filed March 1, 2004.  On February 25, 2003, the assigned United States District Judge referred this matter to the undersigned United States Magistrate Judge to submit proposed findings of fact and recommendation for disposition of this case pursuant to 28 U.S.C. § 636(b)(1).  The United States Magistrate Judge, having considered the Martinez Report, motions, record, relevant law, and being otherwise fully advised, recommends that summary judgment in favor of Defendants be **GRANTED**.

### PROPOSED FINDINGS

1.      Plaintiff, a pro se litigant proceeding in forma pauperis, filed a Civil Rights Complaint in this Court on February 19, 2003 alleging that Defendants acted with deliberate indifference to a serious medical condition and that such action constituted cruel and unusual punishment in violation of the Eighth Amendment.  The Complaint seeks injunctive relief as well as compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

2.      On August 14, 2003, the district judge issued a Memorandum Opinion and Order

dismissing the claims as to Defendant John Shanks.  On October 14, 2003, the remaining

defendants answered the Complaint, denying liability and advancing affirmative defenses.

3.      On October 23, 2003, I directed Defendants to submit a Martinez Report

addressing each claim contained in Plaintiff's Complaint.  The parties were notified that the

Martinez report may be used in deciding whether to grant summary judgment on Plaintiff's claims,

whether by Motion or *sua sponte*, and that the parties should submit whatever materials they

considered to be relevant to Plaintiff's claims.  *See Hall v. Bellmon*, 935 F.2d 1106 (10th Cir.

1991).

4.      Defendants submitted their Martinez Report on December 29, 2003 and an

Appendix to that report on February 13, 2004.  Plaintiff did not submit a Martinez Report or

affidavits nor did he object to any portion of Defendants' Martinez Report.  Defendants also filed

a Motion for Summary Judgment on Plaintiff's claims on March 1, 2004 and an Appendix thereto

on March 2, 2004.  Plaintiff has not responded to this Motion.

5.      Defendants have submitted evidence that Plaintiff underwent a medical intake

screening process at the Western New Mexico Correctional Facility in November of 1998.  He

reported having taken Ultram for a herniated disk.  The physician's assistant prescribed 800 mg of

Motrin twice a day for back pain and ordered lab work and an EKG due to Plaintiff's age (over

40).  (Def. Ex. C.)

6.      On November 30, 1998, Plaintiff underwent a physical examination.  At that time,

he reported having suffered a myocardial infarction in 1990, having undergone two angioplasties,

and complained of shortness of breath with smoking and chest pain with exercise.  Plaintiff also

reported a lumbar spine fusion and chronic back pain as well as weakness in the left leg.  Plaintiff

2

was told to replace the Motrin with Naprosyn, was counseled on high risk behavior, including smoking, and was scheduled to see a doctor to evaluate angina. (Def. Ex. B-2, B-3.) Plaintiff also underwent a chest x-ray which revealed a normal cardiomediastinal silhouette. (Def. Ex. B-4.)

       7.      On December 8, 1998, Plaintiff was seen by Dr. Deming for a follow-up of his angina. It was noted that Plaintiff had smoked three packs of cigarettes a day for approximately 34 years. He reported experiencing an episode of chest pain on November 20, 1998 while carrying his mattress. Plaintiff was questioned about his family history of heart disease and his symptoms of chest pain. Plaintiff's history of back surgery was also discussed. Plaintiff was advised to take one aspirin per day and was scheduled for a follow-up with the cardiac chronic clinic. Plaintiff was instructed to return to the clinic for an EKG if he experienced further chest pain. Dr. Deming obtained Plaintiff's signature on a Consent to Release of Medical Records form in order to obtain his records from hospitals in Lubbock, Texas and Lovington, New Mexico pertaining to alleged myocardial infarctions. (Def. Ex. B-5, C-E.)

       8.      On December 18, 1998, Dr. Deming received Plaintiff's records from Lubbock, Texas. These indicated that what Plaintiff reported as a myocardial infarction had in fact been an episode of duodenitis, gastritis, and esophagitis. Plaintiff's doctors had ruled out myocardial infarctions at that time, based on a normal EKG and angiogram and Plaintiff was treated for gastrointestinal conditions. Plaintiff was noted to have a history of esophageal spasms. (Def. Ex. B-6.)

       9.      On December 18, 1998, Plaintiff submitted a Request for Medical Service indicating that he needed to see a doctor and be released from work detail because of back pain.

(Def. Ex. B-7.)

10.     Plaintiff's chart was referred to Dr. Deming for review on December 19, 1998 due to medication non-compliance.  Plaintiff was noted to have missed nine of thirty-six doses of Naprosyn.  Plaintiff was to be treated with Tagamet and nitroglycerin for his esophogeal spasms. Plaintiff was again encouraged to stop smoking.  (Def. Ex. B-8.)

11.     On January 5, 1999, following a transfer to the Penitentiary of New Mexico, Plaintiff requested an appointment to be seen for low back pain and indicated that his current medications were not helping.  (Def. Ex. B-11.)

12.     On January 6, 1999, Plaintiff saw a physician's assistant complaining of back and chest pain.  He indicated the chest pain was relieved by taking nitroglycerin.  Plaintiff was scheduled for a spinal x-ray and follow-up appointments with the hypertension chronic clinic and the gastrointestinal chronic clinic.  (Def. Ex. B-12.)

13.     On February 4, 1999, after being transferred to the Guadalupe County Correctional Center, Plaintiff continued to complain of back pain and requested Naprosyn.  Upon examination, Plaintiff exhibited a full range of motion without pain.  He had no complaints of chest pain at that time.  Plaintiff was given Motrin and was scheduled to see a physician for his back pain.  (Def. Ex. B-14.)

14.     On February 11, 1999, Plaintiff was seen by a doctor for complaints of back and chest pain.  Plaintiff reported pain radiating into both legs and no relief with Naprosyn.  Plaintiff was instructed to continue taking Naprosyn and begin abdominal strengthening exercises. Plaintiff was also advised to lose weight.  Plaintiff was noted to be at increased risk for cardiac problems due to family history and a long history of smoking.  Plaintiff was counseled on smoking

4

cessation and was told to continue the nitroglycerin as needed.  (Def. Ex. B-17.)

15.     Plaintiff was seen at the hypertension chronic clinic on February 23, 1999.  He reported shortness of breath with exertion but was noted to have a normal heart examination. The physician believed Plaintiff had esophageal spasms rather than angina.  Plaintiff was put on a diet, was instructed on exercise and was again counseled on smoking cessation.  (Def. Ex. B-18.)

16.     Plaintiff reported to the infirmary on February 27, 1999 complaining of chest pain with no relief from nitroglycerin.  Plaintiff was placed on a cardiac monitor, received oxygen and was given aspirin and sublingual nitroglycerin, after which he reported a decrease in pain.  He was then transferred to the Guadalupe Health Services Emergency Room for evaluation.  (Def. Ex. B-19.)

17.     Plaintiff was admitted to the Emergency Room for observation due to his family history of heart disease and his self-reported history of cardiac disease.  Plaintiff was found to have a normal EKG and decreased chest pain with aspirin and nitroglycerin.  Plaintiff was diagnosed with unstable angina and pneumonia and was discharged back to the prison on February 28, 1999.  He was advised to take Zithromax and follow a low salt, low fat diet.  (Def. Ex. F.)

18.     Plaintiff followed up with a physician's assistant on March 1, 1999 at which time signs of pneumonia were discussed.  A treadmill test was scheduled.  This test, performed on March 29, 1999, could not be completed as Plaintiff complained of leg pain and fatigue.  No arrhythmias or ischemic changes were noted however.  Plaintiff was found to be of below-average cardiorespiratory fitness for his age.  (Def. Ex. B-21, B-22, G.)

19.     A May 11, 1999 examination at the hypertension/cardiovascular clinic revealed

Plaintiff's heart to be within normal limits.  Dr. Brown believed Plaintiff was suffering from

esophageal spasm rather than cardiovascular problems and discharged Plaintiff from the clinic.

Plaintiff was instructed to continue nitroglycerin as needed, continue the heart smart diet, stop

smoking and increase exercise.  (Def. Ex. B-23.)

20.     Plaintiff reported to the infirmary on August 26, 1999 complaining of back pain.

He was given a week of total bed rest and was told to take Tylenol 3 every 8 hours as needed in

addition to Naprosyn.  He was instructed to return to the clinic if his pain increased.  (Def. Ex. B-

24.)

21.     Plaintiff was again seen in the infirmary on November 20, 1999 following a fall on

the stairs at which time he twisted his back.  Plaintiff was given Ibuprofen, instructed to use a hot

compress and follow up with the doctor in several days with instructions to return if the pain

increased.  (Def. Ex. B-25.)

22.     On January 16, 2000, Plaintiff reported to the infirmary complaining of midline

chest pain and pain radiating into the left arm.  He indicated he had already taken nitroglycerin.

He was placed on oxygen, given an EKG as well as sublingual nitroglycerin and a GI cocktail of

Maalox and viscous Lidocaine.  After Plaintiff indicated his pain was increasing he was given an

aspirin and was taken to Guadalupe County Hospital Emergency Room by ambulance.  At the

hospital, Plaintiff self-reported blocked coronaries with no intervention.  Plaintiff's physical

examination was found to be within normal limits and he was diagnosed with non-specific chest

pain.  Plaintiff was discharged with instructions to take 800 mg of Ibuprofen every six hours as

needed.  (Def. Ex. B-26, H.)

23.     Plaintiff was scheduled to see Dr. Brown for a cardiac follow-up on January 28,

2000. Plaintiff refused to see the doctor stating he didn't have chest pain anymore. Plaintiff then signed a refusal and left the clinic. (Def. Ex. B-28, B-29.)

24.     Plaintiff was scheduled to see Dr. Brown at the gastrointestinal clinic on February 3, 2000. He again refused to be seen and signed a refusal. (Def. Ex. B-30, B-31.)

25.     On June 7, 2000, Plaintiff had an appointment with Dr. Brown. He again refused to be seen and signed a refusal. (Def. Ex. B-33, B-34.)

26.     Plaintiff was transferred from Guadalupe County Correctional Facility to the Penitentiary of New Mexico on October 30, 2000. His chart was reviewed at that time by Dr. Penn who noted a doubtful myocardial infarction, a negative but suboptimal stress test and an abnormal ECG. The abnormal ECG was thought to be the result of COPD. Plaintiff was referred to a physician's assistant. (Def. Ex. B-35, B-36.)

27.     In December of 2000, Plaintiff was transferred to the Western New Mexico Correctional Facility. On January 26, 2001, Plaintiff was seen in sick call for complaints of back pain. Range of motion was decreased and Plaintiff was diagnosed with a strain. He was given Motrin, Robaxin and a medical idle for two days. He was also instructed on range of motion and strengthening exercises. (Def. Ex. B-38, B-39.)

28.     On January 30, 2001, Plaintiff was noted to be noncompliant with his Robaxin, having taken none of the 13 doses since the drug was prescribed. (Def. Ex. B-40.)

29.     On April 16, 2001, Plaintiff again complained of severe back spasms and pain. He was seen on April 19, 2001 by a physician's assistant. Plaintiff reported increased problems when bending, stooping or during prolonged exertion. (Def. Ex. B-41, B-42.)

30.     The physician's assistant reviewed Plaintiff's old medical records from his spinal

7

fusion on April 20, 2001.  The records indicated Plaintiff's previous orthopedist had counseled against surgical intervention and that Plaintiff had been noncompliant with the therapy programs prescribed for him.  (Def. Ex. I.)

31.     On May 8, 2001, Plaintiff requested Motrin for back pain because of increased soreness and discomfort with the duties of his current job assignment.  The Motrin was increased and Plaintiff was placed on restricted work duty.  (Def. Ex. B-45.)

32.     On July 16, 2001, Plaintiff continued to complain of poor pain control and on July 17, 2001 was given Robaxin and Disalcid for the pain as well as an extra mattress for his bed. (Def. Ex. B-47, B-48.)

33.     Plaintiff was noted to have been compliant with these medications as of August 20, 2001.  (Def. Ex. B-49.)

34.     On December 19, 2001, Plaintiff was transferred to Central Minimum Restrict Unit.  (Def. Ex. B-50.)

35.     Nurse Practitioner Jimmy Padilla examined Plaintiff on January 21, 2002.  Plaintiff indicated a history of chest pain and reported smoking three packs of cigarettes a day for 35 years.  Physical examination revealed a normal heartbeat and restricted forward range of motion. Plaintiff was instructed to perform back exercises, was given a light duty slip and was scheduled for an EKG and lab work.  (Def. Ex. B-52, B-53.)

36.     Plaintiff was scheduled for a stress echocardiogram on January 30, 2002 because of an abnormal EKG.  He was instructed to take one aspirin every day and was prescribed Lescol. (Def. Ex. B-55.)

37.     The stress echocardiogram was attempted on February 21, 2002, but had to be

terminated because Plaintiff complained of dizziness.  No arrythmias were noted during the test

and no abnormalities were found at the level Plaintiff was able to reach.  However, the test was

noted to be inadequate for accurate diagnosis.  (Def. Ex. J.)

38.     On February 27, 2002, Plaintiff reported to the infirmary with complaints of chest

pain that had occurred the previous day.  Plaintiff exhibited tenderness on the chest wall and

shoulder upon palpation.  He was diagnosed was atypical chest pain and was scheduled for an

EKG.  The Lescol dose was increased and Plaintiff received a lay in pass for the following day.

(Def. Ex. B-59.)

39.     An EKG performed on February 28, 2002 was abnormal.  However, the test did

not reveal any significant changes from previous EKGs.  (Def. Ex. B-60, B-61.)

40.     On May 9, 2002 Plaintiff submitted a Medical Request slip complaining of severe

lower back and right leg pain.  He was seen in sick call on May 10, 2002.  Decreased range of

motion was noted and he was scheduled to see a provider for pain management.  (Def. Ex. B-66,

B-67.)

41.     On May 16, 2002, Plaintiff was seen by nurse practitioner Jimmy Padilla.  He

reported smoking a pack of cigarettes a day and getting no exercise.  Plaintiff was noted to have

limited range of motion in his back because of inactivity and the previous disc fusion.  Plaintiff

was advised to stop smoking, increase exercise and lose weight.  He was instructed to return in

two weeks and his prescriptions for aspirin and Lescol were extended.  (Def. Ex. B-70.)

42.     Plaintiff was evaluated by Dr. Featherstone on May 21, 2002 for chest and lower

back pain.  Plaintiff self-reported heavy smoking and family history of coronary artery disease.  He

also indicated his pain medication was not helping his back pain.  Dr. Featherstone noted

Plaintiff's strong risk factors for coronary artery disease and indicated additional testing was warranted.  Plaintiff was again advised to stop smoking and his pain medication was changed to Baclofen.  (Def. Ex. B-72.)

43.    Plaintiff was again seen by Jimmy Padilla on June 3, 2002.  He complained of shortness of breath at that time but had no chest pain.  He reported having chest pain during the previous week which was resolved by taking nitroglycerin.  He also indicated that the Baclofen was helping his back.  Plaintiff was again advised to stop smoking.  (Def. Ex. B-73.)

44.    On June 4, 2002, Plaintiff was seen in the clinic complaining of chest pain and shortness of breath.  He had not taken anything for the pain.  Plaintiff had chest wall tenderness, but his EKG was negative.  He was diagnosed with chest wall pain and was given Motrin.  (Def. Ex. B-74.)

45.    Plaintiff followed up at the infirmary on June 5, 2002 at which time he reported no further chest pain and decreased pain to the chest wall.  He was given a light duty slip and instructed to return to the clinic as needed or scheduled.  (Def. Ex. B-76.)

46.    Plaintiff again reported to the infirmary on June 11, 2002 with complaints of chest pain not relieved by nitroglycerin.  An EKG was performed and Plaintiff was given aspirin and oxygen.  He was transported to St. Joseph's Emergency Room for evaluation.  (Def. Ex. B-77.)

47.    At the Emergency Room, Plaintiff self-reported a past heart attack and catheterization as well as frequent chest pain.  He reported smoking ½ to 2 ½ packs of cigarettes per day for 37 years.  His EKG was 'not alarming', his chest x-ray was normal and his cardiac markers showed no myocardial damage.  He was admitted for observation and was put on a Heparin drip for the night.  He was again advised to stop smoking.  (Def. Ex. K-1-K-3.)

48.     On June 12, 2002, Plaintiff reported no further chest pain and a myocardial infarction was ruled out.  The Heparin drip was discontinued and Plaintiff was referred to Dr. Garcia for a cardiac consultation.  Dr. Garcia believed Plaintiff's EKG indicated an old myocardial infarction and recommended a dobutamine stress test for further evaluation.  (Def. Ex. K-4, K-5.)

49.     Plaintiff underwent the dobutamine echocardiogram test on June 13, 2002.  This test showed a right axis deviation, but no arrythmias or ischemic changes during the procedure. The echocardiogram showed good systolic function and no evidence of a previous myocardial infarction.  It was felt the test was negative for stress-induced ischemia.  (Def. Ex. K-6.)

50.     On June 14, 2002, Plaintiff was discharged from St. Joseph's Hospital with instructions.  Upon return to the Central New Mexico Correctional Facility, Plaintiff refused to remain in the Long Term Care Unit, where he could be observed.  (Def. Ex. K-8, B-78, B-79.)

51.     On June 30, 2002, Correctional Medical Services, Inc.'s contract to provide healthcare for the New Mexico Department of Corrections expired.  (Def. Ex. C.)

**STANDARD**

This court liberally construes the pleadings of pro se litigants and holds them to a less stringent standard than is required of pleadings prepared by a lawyer.  *See Gillihan v. Shillinger*, 872 F.2d 935, 938 (10th Cir. 1989).  At the same time, the court may not assume the role of advocate for the pro se litigant, and need not accept as true unsupported conclusory allegations. *Hall*, 935 F.2d at 1110.  A motion for summary judgment may be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. PRO. 56(c).  Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact. *Muñoz v. St. Mary Corwin Hosp.*, 221 F.3d

1160, 1164 (10th Cir. 2000)(quoting Rule 56(c)).  When applying this standard, the Court

examines the record and makes all reasonable inferences in the light most favorable to the non-

moving party. *Id.*

     The movant bears the initial burden of establishing that no genuine issue exists as to any

material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Where the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

genuine issue for trial. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986)(quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)).

The movant's initial burden may be discharged by showing there is an absence of evidence to

support the non-moving party's case. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986).  When

the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden

at the summary judgment state by identifying 'a lack of evidence for the non-movant on an

essential element o the non-movant's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 644, 671

(10th Cir. 1998).

     Once the movant meets its burden, the burden shifts to the non-moving party to

demonstrate a genuine issue for trial on a material matter. *See McGarry v. Pitkin Co.*, 175 F.3d

1193, 1201 (10h Cir. 1999).  If the moving party satisfies its initial burden, the party opposing the

motion for summary judgment may not rest upon mere allegations or denials in the pleadings, but

must set forth specific facts showing there is a genuine issue for trial as to a dispositive matter for

which it carries the burden of proof. *See Muñoz*, 221 F.3d at 1164.  It is not sufficient simply to

show that there is some metaphysical doubt as to the material facts. *Matsushita*, 475 U.S. at 586.

An issue of material fact is genuine if a reasonable jury could return a verdict for the party

opposing the motion.  *See Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1313 (10th Cir.

1999).

### ANALYSIS

### Defendants' Actions do not rise to a Level of Deliberate Indifference

Plaintiff alleges that Defendants violated his rights under the Eighth Amendment by

evidencing a deliberate indifference to his medical conditions by failing to give him proper pain

medications and by withholding 'life sustaining' drugs.  To prevail on a claim for denial of medical

care under the Eighth Amendment, petitioner must show that the defendant was deliberately

indifferent to a medical need.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  The condition

complained of must be sufficiently serious to implicate constitutional protection and the prison

official(s) must have acted with deliberate indifference to the petitioner's health.  *Farmer v.*

*Brennan*, 511 U.S. 825, 834 (1994); *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).

The objective component of the test is met if the deprivation is 'sufficiently serious', that

is, if the deprivation is one that has been diagnosed by a physician as mandating treatment or one

that is so obvious that even a layperson would easily recognize the necessity for a doctor's

attention.  *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999).  The subjective component of

the analysis, deliberate indifference, is satisfied if an officer knows of and disregards an excessive

risk to a detainee's health or safety.  *Sealock*, 218 F.3d at 1209 (quoting *Farmer*, 511 U.S. at

837.)  The Court has defined deliberate indifference as equal to recklessness in which a person

disregards a risk of harm of which he is aware.  *Farmer*, 511 U.S. at 836-837.

Defendants have provided this Court with numerous medical records from the time of

Plaintiff's incarceration which indicate that Plaintiff was seen by medical personnel and received treatment on many occasions for both his back problems and complaints of chest pain. (Doc. 22.) A careful examination of these records fails to disclose that Defendants' actions rose to the level of deliberate indifference. It is therefore Plaintiff's burden to provide evidence to the contrary in order to survive summary judgment. *Celotex v. Catrett*, 477 U.S. 317, 322-323 (1986). However, Plaintiff has not responded to Defendants' motion for summary judgment. Because Defendants have met their burden with respect to their motion and because Plaintiff has not provided this Court with evidence tending to refute Defendants' argument, I recommend that Defendants' Motion be granted.

**Plaintiff lacks an Expert Witness**

Defendants also contend that Plaintiff's claims should be dismissed because he has not offered expert testimony supporting his contentions of medical malpractice or negligence. While Defendants are correct to point out that expert testimony is generally necessary to prove negligence in the case of medical malpractice, *see Crouch v. Most*, 78 N.M. 406, 410 (1967), examination of the Complaint in this case makes clear that Plaintiff does not claim that Defendants committed medical malpractice. Rather, Plaintiff claims that Defendants acted with deliberate indifference to his medical needs and that their conduct vis-a-vis his medical complaints rose to the level of a constitutional violation. (Compl. ¶¶ B, C.) Because Plaintiff does not claim negligence on the part of Defendants, I need not consider whether Plaintiff has failed to provide enough evidence to prevail on a negligence claim. As such, I recommend that Defendants' contention with respect to Plaintiff's lack of expert testimony should be rejected.

14

**Plaintiff has Failed to Exhaust Requisite Administrative Remedies**

Defendants next contend they are entitled to summary judgment because Plaintiff has failed to exhaust the requisite administrative remedies.  With respect to the Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e, Defendants' contention regarding Plaintiff's failure to exhaust is correct and I recommend that summary judgment be granted on this issue.  The PLRA requires that available administrative remedies be exhausted prior to filing an action with respect to prison conditions under § 1983.  *Jernigan v. Stuchell*, 304 F.3d 1030. 1032 (10th Cir. 2002).  Congress has eliminated both discretion to dispense with administrative exhaustion and the condition that administrative exhaustion be 'plain, speedy and effective.'  *Booth v. Churner*, 532 U.S. 731, 740 (2001).  Even where the available remedies would appear to be futile at providing the kind of remedy sought, the prisoner must exhaust the administrative remedies available.  *Id*. at 740.  Administrative review by corrections officials is intended to reduce the quantity and improve the quality of prisoner suits.  *Steele v. Federal Bureau of Prisons*, 355 F.3d 1204, 1207 (10th Cir. 2003)(quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002)).  The PLRA's exhaustion requirement applies to all suits about prison life.  *Porter*, 534 U.S at 525.

In the case of prisoner civil-rights complaints, the prisoner must provide a clear statement of the important facts supporting his claim and explain his attempts to exhaust available administrative remedies.  *Steele*, 355 F.3d at 1211.  District courts have routinely expected prisoners to provide a short and plain statement of their claims, as well as *specific* information of exhaustion.  *Id*.  In the absence of particularized averments concerning exhaustion showing the nature of the administrative proceeding and its outcome, the action must be dismissed under § 1997e.  *Id*.  To ensure compliance with the statute, a prisoner must provide a comprehensible

statement of his claim and also either attach copies of administrative proceedings or describe their disposition with specificity. *Id*. In the present case, Plaintiff has merely alleged in his complaint that he has exhausted all administrative remedies, but he provides no documentation or other information about those remedies. Plaintiff has not complied with the mandate of § 1997e and I recommend that summary judgment be granted for failure to exhaust.

Although not necessary to the resolution of this Motion, I must address Defendants' contentions regarding this Court's jurisdiction to hear Plaintiff's claims with respect to § 1997e. Defendants are mistaken in asserting that the failure to meet the exhaustion requirement of § 1997e(a) is a bar to this court's jurisdiction to hear the claim. *Steele*, 355 F.3d at 1208 ("Every federal appellate court faced with the issue has concluded that the § 1997e(a) exhaustion requirement is not a jurisdictional bar"). The Tenth Circuit has held that § 1997e(a) simply codifies the administrative exhaustion doctrine in order to govern the timing of federal-court decisionmaking. The provision does not defeat federal-court jurisdiction, it merely defers it. *Id*.

Defendants also contend that summary judgment must be granted as to Plaintiff's state claims because Plaintiff failed to exhaust his administrative remedies under NMSA 1978 § 33-2-11 (2002). Defendants do not explain what they believe the nature of Plaintiff's state claim to be and from examining the Complaint, I cannot ascertain that Plaintiff has stated a claim under New Mexico law. However, because I have already determined that summary judgment is appropriate on Plaintiff's entire claim for failure to exhaust under 42 U.S.C. § 1997(e), I need not reach the issue of whether summary judgment would also be appropriate for failure to exhaust under the cited New Mexico statute. To the extent any state claims remain unadjudicated, I recommend that this Court refuse supplemental jurisdiction. *See* 28 U.S.C. § 1367(c); *Amazon, Inc. v. Dirt*

*Camp, Inc.*, 273 F.3d 1271, 1276 (10th Cir. 2001).

**No Allegations of Personal Involvement against Defendants Lytle and Murphy**

Defendants next argue that Plaintiff's claims against Defendants Lytle and Murphy should be dismissed because Plaintiff has failed to allege the requisite personal involvement, as required by § 1983 actions, on the part of these Defendants. To successfully assert a claim for a violation of § 1983 under the Eighth Amendment, a Plaintiff must make a showing that the Defendant participated or was personally involved in the alleged wrongful conduct. *Grimsley v. MacKay*, 93 F.3d 676 (10th Cir. 1996). Further, an inquiry into a prison official's state of mind is necessary when evaluating a claim that the official inflicted cruel and unusual punishment. *Graham v. Connor*, 490 U.S. 386 (1989). It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock. *Wilson v. Seiter*, 501 U.S. 294, 299 (1991)(quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

In the instant case, Plaintiff has not alleged in his Complaint that Defendants Lytle and Murphy were ever personally involved or participated in the alleged wrongful conduct. Furthermore, Plaintiff has not alleged that Defendants Lytle and Murphy had a culpable state of mind or that they acted with 'obduracy and wantonness'. Because Plaintiff has failed to make a claim that Defendants Lytle and Murphy violated his Eighth Amendment rights under § 1983, I recommend that Defendants' motion for summary judgment with respect to Defendants Lytle and Murphy be granted.

**Statute of Limitations**

17

Finally, Defendants contend that Plaintiff's claims are barred by the applicable New Mexico statute of limitations relating to § 1983 claims. Section 1983 claims are governed by the personal injury statute of limitations of the state. *Wilson v. Garcia*, 471 U.S. 261, 280 (1985). A Section 1983 action brought in New Mexico is subject to a three-year statute of limitations. NMSA 1978 § 37-1-8 (Repl. Pamp. 1990).[1] The phrase 'personal injury actions', adopted by the Supreme Court, appears to have been viewed as synonymous with the phrase 'injuries to personal rights' and was not intended to be read narrowly. *Meade v. Grubbs*, 841 F.2d 1512, 1523 (10th Cir. 1988)(quoting *Wilson*, 471 U.S. at 278).

In the present case, the voluminous exhibits provided by the Defendants (Doc. 22), containing medical records from Plaintiff's incarceration dating back to November, 1998, show that Plaintiff was aware of his chronic back problems and alleged need for blood thinning medications at that time. The statute of limitations begins to run at such time as the injury manifests itself in a physically objective manner and is ascertainable. *Long v. Weaver*, 105 N.M. 188, 191 (Ct.App. 1986). Plaintiff's Complaint also states that he was aware of a need for immediate back surgery and a need for blood thinning medications at the time of his incarceration in November of 1998. (Compl. ¶¶ B.1, B.2).

Because the record shows that Plaintiff was aware of his back problems and alleged need for back surgery in November of 1998, the statute of limitations, under New Mexico law, began to run at that time. The applicable statute of limitations under New Mexico law for § 1983 action is three years. Therefore, Plaintiff had until November of 2001 in which to file a § 1983 claim for his back problems. Because such a claim was not filed until February of 2003, I find that this

---

[1]"Actions must be brought...for an injury to the person or reputation of any person, within three years."

claim is time-barred and recommend that Defendants' Motion with respect to this issue be granted.

With respect to Plaintiff's claims regarding his blood thinning medications, I find that the statute of limitations began to run, not at the time of incarceration, but at the time of the alleged injury, i.e., the heart attack. I have examined the medical records and cannot ascertain when the alleged heart attack took place. Plaintiff's Complaint simply states, "Approximately a month went by and my health gradually worsened, then I had a heart attack". (Compl. ¶ B.2.) By this, I presume Plaintiff means that approximately one month following his incarceration, or December of 1998, he had a heart attack, but the Complaint does not make certain the date of the alleged incident. Because Defendants have provided evidence in the form of medical records that Plaintiff never suffered a heart attack while incarcerated, the burden shifts to Plaintiff to provide evidence to the contrary. *Celotex*, 477 U.S. at 322-323. Because Plaintiff has not provided this Court with evidence as to the time of his alleged heart attack, I recommend that Defendants' Motion regarding the applicable statute of limitations be granted.

**PROPOSED DISPOSITION**

I recommend that Defendants' Motion for Summary Judgment, filed on March 1, 2004 (Doc. 20) be granted. To the extent any state claims are not disposed of, I recommend that this Court deny supplemental jurisdiction over these claims and dismiss them. Objections to the foregoing may be made pursuant to 28 U.S.C. § 636(b)(1)(C). Within ten days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to § 636(b)(1)(C), file written objections to such proposed findings and recommendations with the Clerk of the United States District Court, 333 Lomas Blvd. NW, Albuquerque, NM 87102. A

party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

_____

**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**